UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

ANTHONY ZAPPIN,

         Plaintiff,

      v.

NYP HOLDINGS, INC. d/b/a THE NEW
YORK POST and JULIA MARSH,

         Defendants.

---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  March 26, 2018

16 Civ. 8838 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

    Plaintiff Anthony Zappin brings this defamation action against NYP

Holdings, Inc., doing business as *The New York Post*, and reporter Julia Marsh

(collectively, "Defendants") for statements made in a November 13, 2015 *Post*

article (the "Article") that reported on Plaintiff's divorce proceedings before New

York State Supreme Court Justice Matthew F. Cooper.  Plaintiff has brought

four federal lawsuits in this Court stemming from these divorce proceedings;

three of them are resolved as of this date.  On August 9, 2017, the Court

dismissed a similar defamation claim against *The New York Daily News*.

*Zappin* v. *Daily News, L.P.*, No. 16 Civ. 8762 (KPF), 2017 WL 3425765 (S.D.N.Y.

Aug. 9, 2017) ("*Zappin Federal I*").  And the Court addresses today, in a

separate Opinion, Plaintiff's claims against Justice Cooper.  *See Zappin* v.

*Cooper*, No. 16 Civ. 5985 (KPF) ("*Zappin Federal III*").  Plaintiff also recently filed

a fourth lawsuit, this time against several judges; individuals involved with the

attorney disciplinary process in the New York State Supreme Court Appellate

Division, First Department; and the New York County District Attorney. *See*

*Zappin* v. *Collazo*, No. 17 Civ. 8837 (KPF).

As in *Zappin Federal I*, Defendants here move to dismiss Plaintiff's First

Amended Complaint (the "FAC") on the basis that the Article is absolutely

privileged as a fair and true report of a judicial proceeding. For the reasons

that follow, Defendants' motion is granted.

BACKGROUND[1]

## A.    Factual Background

### 1.    The November 12, 2015 Proceedings

For purposes of the instant motion, the Court takes as true the well-

pleaded allegations in the FAC. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

In February 2014, Plaintiff initiated a divorce action (the "Divorce Action")

against his then-wife, Claire Comfort, in New York State Supreme Court, New

York County. *See Zappin* v. *Comfort*, Index No. 301568/14. (FAC ¶ 9). As this

Court observed in the *Daily News* matter, the Divorce Action has a lengthy

history that is largely irrelevant to Plaintiff's defamation claim and Defendants'

correlative motion to dismiss. The Court will recount only those facts

necessary to resolve Defendants' motion.

---

[1]     This Opinion draws from the FAC (Dkt. #22), Defendants' November 13, 2015 article
(the "Article" (Dkt. #22-1)), and the transcript of the November 12, 2015 trial
proceedings before Justice Cooper ("Hearing Tr."), the latter of which is attached as
Exhibit A to the Declaration of Robert D. Balin in Support of Defendants' Motion to
Dismiss the Amended Complaint. For convenience, Defendants' moving brief is referred
to as "Def. Br." (Dkt. #29); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #33); Plaintiff's
Declaration as "Zappin Decl." (Dkt. #38); and Defendants' reply brief as "Def. Reply"
(Dkt. #36). Defendants' moving papers were filed under seal.

Two months before trial on various custody and access issues in the Divorce Action, Justice Cooper issued an order imposing sanctions on Plaintiff in the amount of $10,000, based on the court's finding that Plaintiff had "use[d] his law license as a tool to threaten, bully, and intimidate," thereby "call[ing] into question his fitness to practice law." *Zappin* v. *Comfort*, 26 N.Y.S.3d 217 (Table), 2015 WL 5511519, at *1, 14 (N.Y. Sup. Ct. Sept. 18, 2015) (the "Sanctions Decision"), *aff'd*, 49 N.Y.S.3d 6 (1st Dep't 2017).[2]  In the Sanctions Decision, Justice Cooper discussed antecedent litigation between the parties in the Superior Court of the District of Columbia; in the course of so doing, Justice Cooper described Plaintiff as "aggressively hostile to the [Superior Court] judge's criticism of his conduct as a self-represented attorney." *Id.* at *2.

Trial began on November 12, 2015, before Justice Cooper.  (FAC ¶ 10). "Defendant Marsh was present in the courtroom throughout the proceeding." (*Id.*).  The first witness at trial was Dr. Alan Ravitz, the court-appointed "'neutral' forensic custody evaluator."  (*Id.* at ¶¶ 9-10).  Following the custody evaluation process, Ravitz had authored a forensic custody report.  (*Id.* at ¶ 9). Among other complaints, Plaintiff alleges that Comfort's counsel used his cross-examination of Ravitz to "gratuitously read from the forensic custody

---

[2]     Plaintiff contends the Sanctions Decision is statutorily sealed.  (Pl. Opp. 2).  However, the Court notes that the decision is publicly available.  In any event, the Court considers the Sanctions Decision merely for the fact of what it says, and not for the truth of the matters asserted therein.  *See Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order 'to determine what statements [the documents] contained' — but 'again not for the truth of the matters asserted.'" (emphases removed) (quoting *Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991))).

report (which was already in evidence) containing Ms. Comfort's false and unsubstantiated allegations." (*Id.* at ¶ 10).

Dr. Ravitz was called as a court witness. (Hearing Tr. 6:14-22).[3] He testified — both on cross-examination by Plaintiff and on cross-examination by Comfort's counsel — that in the course of the custody evaluation, Comfort had told him that Plaintiff had physically abused her. (*Id.* at 21:8-11, 82:21-83:5, 94:15-25). This included an allegation of abuse that occurred when Comfort was 39 weeks pregnant. (*Id.* at 104:13-105:13). Comfort's counsel asked Ravitz about a particular statement attributed to Comfort in Ravitz's report: "[Plaintiff] got angry and he slapped me, he hit my glasses. [Plaintiff] hit me in the head a couple of times. [Plaintiff] grabbed my hand hard and hit me in the stomach with car keys. That night I slept on the couch." (*Id.* at 104:22-25). Ravitz confirmed at trial that Comfort made this statement to him. (*Id.* at 105:7-10). Ravitz also testified that he did not investigate Comfort's abuse claims, but did consider them in the course of conducting his evaluation. (*Id.* at 21:26-22:11 ("I'm an expert in psychiatry and in child psychiatry and in forensic psychiatry. I can look at patterns of allegations but I can't really discuss the v[e]racity of allegations.")). Ultimately, Ravitz "concluded that ... based on the information that [Ravitz] assessed it was [his] opinion that [Plaintiff was] likely [] physically assaultive with [Comfort]." (*Id.* at 22:12-17; *see also id.* at 22:18-23:10, 25:5-10). Plaintiff denied Comfort's abuse

---

[3] The Court discusses its ability to consider the transcript of the November 12, 2015 proceeding *infra*.

allegations and, instead, contended that it was Comfort who was physically abusive. (*Id.* at 197:12-14).

On cross-examination by Comfort's counsel, Dr. Ravitz was asked further about his forensic custody report, including his evaluation of the interactions between Plaintiff and Comfort in the early stages of their relationship and in the days surrounding the birth of their child. (Hearing Tr. 103:3-111:21). During this colloquy, Ravitz testified that he reviewed text-message communications between Plaintiff and Comfort from January and February of 2013. (*Id.* at 103:5-104:5). In describing the "tenor" of the relationship between the parties at that time, Ravitz opined that their text messages were "indicative of the type of relationships that one sees in coercive controlling interpersonal interaction in which one party threatens abandonment, the other party capitulates, and the cycle starts all over again." (*Id.* 103:26-104:5; *see also id.* at 120:10-18). And in discussing the time period immediately following the child's birth in October 2013, Ravitz recalled an allegation by Comfort, included in Ravitz's report, that "[Plaintiff] had a plan to break the neighbor's window so we could have access to Comcast." (*Id.* at 108:20-21). Ravitz testified, however, that Plaintiff had denied this allegation when Ravitz interviewed him. (*Id.* at 108:24-109:3).

Dr. Ravitz also testified about his evaluation of Plaintiff's personality, which evaluation including consideration of Comfort's allegations about Plaintiff's demeanor and actions. For example, Ravitz was asked by Comfort's counsel about an allegation contained in his report that "[Plaintiff] is often

retaliatory. After [Plaintiff] left [the law firm] Quinn Emanuel he told [Comfort] he was going to start an Ashley Madison profile and send it to his boss's wife." (Hearing Tr. 99:5-8). About this, Ravitz was asked whether he concluded in his evaluation that Plaintiff acted in a retaliatory fashion toward Comfort, to which Ravitz responded "[p]robably." (*Id.* at 99:12-14). Later, Comfort's counsel asked Ravitz about his psychiatric testing of Plaintiff, which yielded the following testimony: "The summary of [Plaintiff's] testing ... said that ... [Plaintiff] presents with underlying personality characteristics ... that included categories such as being narcissistic, obsessive compulsive, histrionic and dependent." (*Id.* at 138:22-139:10).

Dr. Ravitz was also cross-examined by the attorney for the couple's child (the "AFC"). Among other topics, the AFC asked Ravitz about Plaintiff's ambivalence toward his career and, relatedly, Plaintiff's claims that Comfort and Justice Cooper had caused him to lose his job. (Hearing Tr. 165:16-167:6). In particular, the AFC asked: "[A]re you aware that Mr. Zappin was fired by his [ ] most recent law firm for whom he was working[,] Mintz Levin?" And later: "And isn't it a fact that he accused Miss Comfort of getting him fired as well from his law firm at that time?" (*Id.* at 166:25-166:3, 166:25-26). Ravitz confirmed that Plaintiff had made this allegation. (*Id.* at 167:4-6).

### 2.  Defendant's November 13, 2015 Article

The next day, on November 13, 2015, Defendants published a short article recounting the November 12, 2015 proceeding, entitled "'Hostile'

mega-lawyer accused of abusing pregnant wife."  (Article).  In its entirety, the

Article reads as follows:

> A Manhattan lawyer who landed a job with the world's
> largest legal firm may be a pit bull at work — but he's a
> monster at home, according to court testimony
> Thursday.
>
> Anthony Zappin, 30, beat his pregnant wife, planned to
> break a neighbor's window to steal cable and Internet
> for his home and schemed to create a fake Ashley
> Madison account to take revenge on an ex-boss,
> according to testimony by a court-appointed therapist,
> relaying his wife's claims.
>
> Zappin's wife, Claire Comfort, 32, a lawyer at Weil,
> Gotshal & Manges, is fighting for primary custody of
> their 2-year-old son.
>
> Zappin is representing himself, even though the
> Manhattan civil judge in the case has fined him $10,000
> for his "aggressively hostile" behavior in court.
>
> The Columbia-educated lawyer once worked at Latham
> & Watkins, ranked as the largest law firm.  He also
> worked for mega-firm Quinn Emanuel Urquhart &
> Sullivan before being fired, according to testimony.
>
> The court shrink depicted Comfort as the better parent,
> calling Zappin "controlling and coercive."
>
> Dr. Alan Ravitz described Comfort's claims that Zappin
> abused her when she was 39 weeks pregnant.
>
> "He got angry and slapped me.  He hit my glasses, he
> hit my head a couple of times.  He grabbed my hand
> hard and hit my stomach with the car keys," Ravitz said
> Comfort told him.
>
> The abuse continued after the birth of their son and up
> until she left Zappin when the boy was nearly 8 weeks
> old, Ravitz said.

Zappin denies he was abusive and claims it was Comfort who got violent.  He read a text he said he sent her.

"Why am I being so mean? Because you're a f--king lunatic who clawed the s--it out of my face and bit my d--k," Zappin read.

After being fired from Quinn Emanuel in 2013, he tried to create an account on the spouse-cheating site, Ashley Madison, in his old boss' name, according to the testimony.

Ravitz said he ordered psych tests for both parents because each "accused the other one of being crazy." The evaluations, he said, found Zappin was "narcissistic, obsessive-compulsive and histrionic" and that Comfort "had low self-confidence" and "an automatic need to obey others who assert authority."

(Article).

### 3.    The Instant Lawsuit

Plaintiff believes much of the Article to be defamatory.  (*See* FAC ¶¶ 12-24).  Specifically, he alleges that the Article is defamatory insofar as it states that Plaintiff: (i) was "hostile" and "aggressively hostile"; (ii) "abus[ed] [his] pregnant wife"; (iii) was a "monster at home"; (iv) "planned to break a neighbor's window to steal cable and Internet for his home"; (v) "schemed to create a fake Ashley Madison [a]ccount to take revenge on an ex-boss"; (vi) was fired from Quinn Emanuel Urquhart & Sullivan ("Quinn Emanuel"); (vii) hit Comfort in the head, grabbed her hand, and hit her stomach with car keys; (viii) continued to abuse Comfort following the birth of their child; and (ix) was "controlling and coercive." (*Id.* at ¶¶ 12-21).

Plaintiff further alleges that the image of Plaintiff that ran alongside the Article is defamatory. (FAC ¶ 22). The image is captioned, "Anthony Zappin leaves the court house earlier this week," and shows Plaintiff standing near an officer from the New York City Police Department (the "NYPD"). (*Id.*). Plaintiff alleges that the "image makes it appear as if Plaintiff is being arrested as Defendants superimposed and/or engineered a photograph with an NYPD police officer in the background as Plaintiff was exiting the courthouse." (*Id.*).

With one exception, Plaintiff does not allege that any of the above-listed statements is an inaccurate rendering of what was said during the proceedings on November 12, 2015. Rather, he alleges that the statements uttered at the proceedings are factually false, i.e., either unsubstantiated or contradicted by other evidence introduced during the trial. (FAC ¶¶ 12-21, 23-29). The only statement in the Article that Plaintiff alleges to be an inaccurate reflection of the day's proceedings is the statement that he was fired from Quinn Emanuel. (*Id.* at ¶ 18). What is more, Plaintiff alleges that Defendants failed to report evidence at trial that was favorable to him, which failure, he argues, renders the Article ineligible for any privilege for "fair and true" reporting of the proceedings. (*Id.* at ¶¶ 23-29).

According to Plaintiff, the Article has "irreparably damaged" his professional reputation, and has "unjustly held [him] up to public contempt, ridicule and disgrace." (FAC ¶ 30). For this, Plaintiff alleges one count of defamation and seeks compensatory and punitive damages.

**B. Procedural Background**

Plaintiff filed the Complaint in this matter on November 14, 2016 (Dkt. #1), and, following a conference with the Court regarding Defendants' proposed motion to dismiss, amended his pleading on January 23, 2017 (Dkt. #22). Defendants filed their motion to dismiss on March 13, 2017 (Dkt. #28); Plaintiff filed his opposition on April 29, 2017 (Dkt. #33); and Defendants filed their reply in support of their motion on May 22, 2017 (Dkt. #36).

## DISCUSSION

**A. Motions to Dismiss Under Rule 12(b)(6)**

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). Toward that end, a complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating whether the FAC meets this standard, the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiff's favor. *ATSI Comms., Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court is not, however, obligated to accept as true legal conclusions couched as factual allegations. *Rolon* v. *Hennenman*, 517 F.3d 140, 148-49 (2d Cir. 2008); *see also Iqbal*, 556 U.S. at 678. Typically, a court must liberally construe pleadings filed by *pro se* litigants and "interpret them to raise the strongest arguments that they suggest." *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (internal quotation

marks and citation omitted). Plaintiff, who is proceeding *pro se*, is an attorney and, accordingly, as "a lawyer representing himself," receives "no such solicitude at all." *Tracy* v. *Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

A court reviewing a pleading on a motion to dismiss must typically confine its consideration to a "narrow universe of materials" and generally may "not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alterations and internal quotation marks omitted). Defendants included with their moving papers a transcript of the November 12, 2015 Divorce Action proceeding. Plaintiff's FAC alleges that the Article mischaracterizes the November 12, 2015 proceedings to the point that it defames him; he discusses evidence presented that was not recounted in the Article and, at times, quotes from the proceedings. (FAC ¶¶ 16-21, 24-29). The transcript of the proceedings is so intertwined with, and integral to, the allegations presented in the FAC that the Court may properly consider it in deciding the instant motion to dismiss. *See Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (holding that a document could be considered on a 12(b)(6) motion where the pleadings relied heavily on the document's terms and effects); *cf. Goel*, 820 F.3d at 560 (holding that, where testimony from a prior litigation was not referenced in the complaint, it could not be considered on a motion to dismiss).

**B.     The Fair and True Report Privilege Bars This Defamation Action**

**1.     New York Civil Rights Law § 74 Applies to the Article**

Under New York law, "[t]o prove a claim for defamation, a plaintiff must show: [i] a false statement that is [ii] published to a third party [iii] without privilege or authorization, and that [iv] causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Tannerite Sports, LLC* v. *NBCUniversal News Grp.*, 864 F.3d 236, 245 (2d Cir. 2017) (internal quotation marks and emphases omitted) (quoting *Stepanov* v. *Dow Jones & Co.*, 987 N.Y.S.2d 37, 41-42 (1st Dep't 2014)).  A plaintiff cannot prevail on a claim for defamation where the statement is privileged or authorized.  *Abkco Music, Inc.* v. *William Sagan, Norton LLC*, No. 15 Civ. 4025 (ER), 2016 WL 2642224, at *3 (S.D.N.Y. May 6, 2016) (citing *Fuji Photo Film U.S.A., Inc.* v. *McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009)).

One such privilege is codified at § 74 of the New York Civil Rights Law, which provides in relevant part:

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published.

N.Y. Civ. Rights Law § 74.  Under § 74, a report of a judicial proceeding that is "fair and true" is protected by an "absolute privilege," and this privilege is "not defeated by the presence of malice or bad faith."  *Biro* v. *Conde Nast*, 883 F. Supp. 2d 441, 477 (S.D.N.Y. 2012) (internal quotation marks and citations omitted).  As New York courts have recognized, § 74 is intended to protect

12

reports of legal proceedings that are made in the public interest. *Cholowsky* v. *Civiletti*, 887 N.Y.S.2d 592, 595 (2d Dep't 2009) (quoting *Williams* v. *Williams*, 23 N.Y.2d 592, 599 (1969)).

The parties disagree on whether § 74 applies to reports of matrimonial proceedings such as the Divorce Action. Defendants contend that because the November 12, 2015 proceedings were held in open court and were accessible to the public, reports of the proceedings can be protected under § 74. (Def. Br. 15-16). Plaintiff counters that § 74 is categorically inapplicable to matrimonial proceedings, the records of which are statutorily sealed under the New York Domestic Relations Law. (Pl. Opp. 8-9). The application of § 74 turns on the Court's resolution of the parties' competing interpretations of the New York Court of Appeals' decision in *Shiles* v. *News Syndicate Co.*, 27 N.Y.2d 9 (1970).

The *Shiles* Court considered a defamation claim stemming from the publication of three articles that recounted charges made by the plaintiff's spouse in a divorce proceeding. *Shiles*, 27 N.Y.2d at 12. The articles were written based on copies of sealed records from the proceedings that a reporter had obtained from the plaintiff's former spouse. *Id.* at 12 n.1. Because the articles were based on sealed records, the plaintiff appealed to challenge the newspapers' reliance on the § 74 privilege. *Id.* at 10-11.

The Court of Appeals held that the privilege did not bar the plaintiff's defamation action. *Shiles*, 27 N.Y.2d at 18-19. It examined the tension between the § 74 privilege, which protects reporting on public court

proceedings, and § 235 of the New York Domestic Relations Law, which provides that records of matrimonial proceedings are not available to "any one other than the parties or their counsel." *Id.* at 14. It concluded that § 74 could not have been intended to undermine the operation of § 235:

> Notwithstanding its broad language, we do not believe that [§] 74 of the Civil Rights Law was ever intended to defeat th[e] design [of § 235] by extending to persons who, despite [§] 235, were able to obtain such records, the right to publish and disseminate their contents without regard for their truth or falsity or for the harm they may cause to the reputations of the individuals involved.

*Id.* The Court went on to state that "the privilege created by [§] 74 of the Civil Rights Law does not attach to the publication of a report of matrimonial proceedings." *Id.* at 15. As he did in *Zappin Federal I*, Plaintiff seizes on this language to support the proposition that the Domestic Relations Law effects a categorical exception for all matrimonial actions from the § 74 privilege. (Pl. Opp. 7). And as their counterparts at the *Daily News* did, the *Post* argues here that the *Shiles* holding is limited to reporting based on "sealed filings" in divorce actions and does not apply to reports of public court proceedings, matrimonial or otherwise. (Def. Br. 15-16).

The law is as it was in August 2017, when this Court's prior opinion was issued: "There does not appear to be any dispositive judicial guidance from New York federal or state courts about this precise issue in the nearly half century since *Shiles* was decided." *Zappin Federal I*, 2017 WL 3425765, at *8. For this reason, this Court undertook a lengthy analysis of *Shiles* in *Zappin Federal I* and found that the § 74 privilege applies to reporting on matrimonial

proceedings held in open court. *Id.* at *8-10. The Court will not repeat its analysis in detail, but adheres to its prior holding that

> despite the *Shiles* Court's occasional reference to the inapplicability of § 74 to "the publication of a report of matrimonial proceedings," a more nuanced inspection of the decision's facts, analysis, and foundational authorities confirms that *Shiles* does not render the § 74 privilege categorically inapplicable to public judicial proceedings in a matrimonial action.

*Id.* at *9 (quoting *Shiles*, 27 N.Y.2d at 15).

### 2. The Article Is a Fair and True Report of the November 12, 2015 Proceeding

Having held that the § 74 privilege applies to the *Post's* reporting on the November 12, 2015 proceeding in the Divorce Action, the Court must assess whether the Article is a "fair and true report" of that day's proceedings. *See* N.Y. Civ. Rights Law § 74. After considering carefully Plaintiff's arguments to the contrary, the Court concludes in the affirmative.

### a. The Court May Determine the Substantial Accuracy of the Report as a Matter of Law

As was similarly disputed in *Zappin Federal I*, the parties do not agree on whether the Court may evaluate the accuracy of the Article at the pleadings stage. (*Compare* Def. Br. 15, *with* Pl. Opp. 18-19). Plaintiff contends that "Defendants' motion to dismiss should be denied as the question of whether the [] Article [is a fair and true report] is a question of fact for the jury." (Pl. Opp. 18). Not so. Where the parties do not raise any issues of fact as to what was said and "only contest whether the undisputed content of the [allegedly defamatory writing] qualifies as a 'fair and true report' of the undisputed

content of the [underlying proceeding], the Court can resolve the dispute as a matter of law[.]" *Abkco Music, Inc.*, 2016 WL 2642224, at *4 (collecting cases).

### b. The Article Is a Substantially Accurate Report of the November 10, 2015 Proceeding

"For a report to be categorized as 'fair and true' within the meaning of the statute, thus immunizing its publisher from a civil suit sounding in libel, it is enough that the substance of the article be substantially accurate." *Holy Spirit Ass'n for Unification of World Christianity* v. *N.Y. Times & Co.*, 49 N.Y.2d 63, 67 (1979) ("*Holy Spirit Ass'n*"). A writing is "substantially accurate if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Karedes* v. *Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (internal quotation marks and citations omitted).

To be protected by the § 74 privilege, reports of court proceedings need not recount events "with a lexicographer's precision," but rather "must be accorded some degree of liberality." *Holy Spirit Ass'n*, 49 N.Y.2d at 68. This is because, as the New York Court of Appeals has recognized, "a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author." *Id.* However, § 74 "does not afford protection if the specific statements at issue, considered in their context, 'suggest[ ] more serious conduct than that actually suggested in the official proceeding.'" *Karedes*, 423 F.3d at 119 (quoting *Calvin Klein Trademark Tr.* v. *Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001)

(quoting *Daniel Goldreyer, Ltd.* v. *Van de Wetering*, 630 N.Y.S.2d 18, 22 (1st Dep't 1995))).

To invoke the § 74 privilege properly, Defendants need not prove that the statements made at the November 12, 2015 proceeding were, themselves, accurate; rather, all that matters for the application of § 74 is that the Article is a substantially accurate rendering of what was said, even if the testimony given was not true. *Rodriguez* v. *Daily News, L.P.*, 37 N.Y.S.3d 613, 615 (2d Dep't 2016) ("[Section 74] was designed precisely to protect the publisher of a fair and true report from liability for just such an error and to relieve it of any duty to expose the error through its own investigation."); *see also Friedman* v. *Bloomberg L.P.*, 871 F.3d 185, 195 (2d Cir. 2017) ("The Bloomberg Defendants' characterization of the damages sought was an accurate description of what was written in the complaint. ... [T]o the extent there was an inaccuracy here, it is found in the language [plaintiff] used in the prayer for relief."); *Biro*, 883 F. Supp. 2d at 479 ("In some cases [plaintiff] does not allege that ... the Article reports [earlier lawsuits] inaccurately — he argues that the plaintiffs in the original suits were incorrect in their allegations. This is not sufficient to defeat the fair and true report privilege."); *Abakporo* v. *Sahara Reporters*, No. 10 Civ. 3256 (RJD), 2011 WL 4460547, at *8 (E.D.N.Y. Sept. 26, 2011) ("Encompassed within the privilege is the right to publish a fair and true report which contains information that is false as a matter of fact." (internal quotation marks omitted)).

Illustrative of this line of cases is *Rodriguez* v. *Daily News, L.P.*, in which the plaintiff brought a defamation claim against the *Daily News* and WPIX after they reported that he was wanted in connection with an attempted rape. *Rodriguez*, 37 N.Y.S.3d at 614. It was later reported that another individual was arrested for the crime. *Id.* WPIX asserted that the report was privileged under § 74 as an accurate reflection of press releases received from the NYPD that identified the plaintiff as the individual wanted for the crime; the Supreme Court dismissed plaintiff's defamation claim and the Appellate Division affirmed, reasoning that the report was a "substantially accurate report[] of the information provided by the NYPD in its press releases." *Id.* at 615. It mattered not that the allegation made against the plaintiff in WPIX's report turned out to be untrue.

Because § 74 asks only whether the reporting is a substantially accurate representation of the judicial proceedings, the Court's analysis looks to whether the Article accurately reported the proceedings in the Divorce Action on November 12, 2015, and will not look to whether the testimony given was, in fact, true. As noted above, Plaintiff's FAC does not plead that any of the statements in the Article — with one exception — is an inaccurate rendering of the proceedings in the Divorce Action. And in fact the Article is a substantially accurate reporting of the proceedings. For starters, the Article refers to Plaintiff as "hostile" and "aggressively hostile," attributing these descriptors to Justice Cooper. (Article). And in his decision imposing sanctions on Plaintiff, Justice Cooper referred to Plaintiff as "aggressively hostile." Sanctions

Decision, 2015 WL 5511519, at *2. The Article also recounts allegations that Plaintiff "beat," "abused," and "hit" Comfort. (Article). All of these allegations were attributed to Dr. Ravitz, and a review of the transcript shows that Ravitz testified at length about Comfort's allegations that Plaintiff had physically abused her. (Hearing Tr. 21:8-11, 82:21-83:5, 94:15-25, 104:22-25). The Article states that Plaintiff planned to break a neighbor's window to gain access to a cable connection and, further, planned to create an account on the Ashley Madison website in the name of his former boss. (Article). Ravitz testified about both of these allegations — which were relayed to him by Comfort and repeated in his report — and discussed how these alleged incidents both illustrated the interactions between Plaintiff and Comfort and reflected on Plaintiff's personality. (Hearing Tr. 99:5-8, 108:20-21).

Plaintiff makes much of the fact that Defendants did not report his denial of the allegation that he plotted to create a fake Ashley Madison account. (Pl. Opp. 13). He also highlights the fact that Comfort's counsel read out a portion of Dr. Ravitz's report containing Plaintiff's statement that "it was [Comfort's] idea to break the neighbor's window" (Pl. Opp. 12 (quoting Hearing Tr. 108:25-26)), which statement Plaintiff contends Defendants should have included in the Article. These arguments fail. There is no obligation for a report to tell all sides of a story to be substantially accurate. *Cholowsky*, 887 N.Y.S.2d at 596 ("[T]here was no requirement that the publication report the plaintiff's side of the controversy[.]"). What matters is that the publication, as written, would not produce a different effect on the reader than would a report containing the

"precise truth." *Id.* In light of the other, more troubling allegations against Plaintiff that are described in the Article, the inclusion of Plaintiff's denial of the Ashley Madison allegation and his statement that it was, by his account, his ex-wife's idea to steal their neighbor's cable connection would not cause the piece to produce a different effect on the reader. *See Holy Spirit Ass'n*, 49 N.Y.2d at 68 (noting that reports are not protected by § 74 where they "suggest[] more serious conduct than that actually suggested in the official proceeding" (internal quotation marks omitted)).

The Article goes on to say that Dr. Ravitz had referred to Plaintiff as "controlling and coercive," as well as "narcissistic, obsessive-compulsive, and histrionic." (Article). In discussing communications between Plaintiff and Comfort that he reviewed, Ravitz testified that their conversations typified a "coercive controlling interpersonal interaction." (Hearing Tr. 103:26-104:5) While Ravitz's "controlling and coercive" remark described the interaction between the parties in that dispute and not solely the Plaintiff, Ravitz testified later that Plaintiff's behavior was "coercive." (*Id.* at 135:5-21). And in discussing the results of his psychiatric testing of Plaintiff, Ravitz testified that Plaintiff presented as "narcissistic, obsessive-compulsive, histrionic and dependent." (*Id.* at 138:22-139:10). The Article is a substantially accurate report of this testimony.

Changing tack, Plaintiff notes that the statement in the Article that he was fired from Quinn Emanuel is not accurate, as "there was no testimony adduced … that Plaintiff was fired from [Quinn Emanuel]." (FAC ¶ 18; Pl.

Opp. 13). Defendants concede that there was no testimony that Plaintiff was fired from Quinn Emanuel. (Def. Br. 22). There was, however, discussion during the proceedings that Plaintiff had "left Quinn Emanuel" (Hearing Tr. 99:5-11), and mention that he was fired from at least one other law firm, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin") (*id.* at 165:26-166:3). That the Article erroneously stated that it was Quinn Emanuel, not Mintz Levin, from which Plaintiff was said to have been fired does not render the Article so inaccurate as to remove it from the protection of the § 74 privilege. *See Holy Spirit Ass'n*, 49 N.Y.2d at 68 (finding that reports should not be analyzed "with a lexicographer's precision").

Undeterred, Plaintiff argues that the Article's imprecision on this point is a distortion that speaks to Defendants' "unfair and deceitful attempt to lend credibility to Ms. Comfort's false allegation[s.]" (Pl. Opp. 14). But there is nothing in Plaintiff's pleading, even with the low bar imposed by Rule 12(b)(6), to support such a finding, and the transcript of the hearing discloses a confusing and imprecise colloquy about the timeline of Plaintiff's employment at various law firms. (*See* Hearing Tr. 165:13-168:3). Accordingly, the Court finds that the Article is a substantially accurate reflection of the proceedings and is absolutely privileged under § 74.

Finally, Plaintiff's claim that he was defamed by Defendants' statement that he was a "monster at home" cannot prevail. (FAC ¶14). Plaintiff states that this is "a statement of fact" (*id.*), but it is not. This characterization of Plaintiff is sensational, to be sure, but it is a statement of pure opinion that

reflects Defendant Marsh's "subjective viewpoint." *Holy Spirit Ass'n*, 49 N.Y.2d at 68. As such, it is not actionable "no matter how vituperative or unreasonable it may be." *Steinhilber* v. *Alphonse*, 68 N.Y.2d 283, 289 (1986).

## C. The Preclusive Effect of the Divorce Action

Even if the § 74 privilege did not apply to the Article — and it plainly does — Plaintiff would nevertheless be unable to prevail on that portion of his defamation claim that is based on the statements in the Article that he "abused," "beat," "slapped," and "hit" Comfort. Under New York law, Plaintiff must affirmatively prove the falsity of these statements. *Tannerite*, 864 F.3d at 244-45 ("Falsity is an element of defamation under contemporary New York law."). Thus, to survive a motion to dismiss, Plaintiff "must plead facts that, if proven, would establish that the defendant's statements were not substantially true." *Id.* at 247. Plaintiff tries, but ultimately fails, to do just that.

The FAC is replete with allegations that the incidents of abuse discussed during the November 12, 2015 proceeding, and as reported in the Article, were undermined by evidence admitted later in the trial that Defendants did not include in the Article. (FAC ¶¶ 16-21, 24-29). As an initial matter, the Court agrees with Defendants that it is difficult to fault them for not including in the Article evidence that had not yet been presented during the trial.[4] More fundamentally, Defendants argue that this amounts to little more than a

---

[4]     Conversely, the Court does not agree with the suggestion in Plaintiff's brief (*see* Pl. Opp. 15-18), that reporting on a multi-day trial carried with it an obligation to either report on proceedings that occurred each day or refrain from reporting until the trial was concluded.

belated attempt to relitigate the Divorce Action. (Def. Br. 8-14). The Court agrees.

It is well-established that "[u]nder New York Law, collateral estoppel precludes a plaintiff from contesting in a subsequent action issues clearly raised in a prior proceeding and decided against that party, irrespective of whether the tribunals or causes of action are the same[.]" *El-Shabazz* v. *State of N.Y. Comm. on Character & Fitness for the Second Judicial Dep't*, 428 F. App'x 95, 96-97 (2d Cir. 2011) (summary order) (collecting cases). Accordingly, where "the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action," collateral estoppel will apply. *Id.* at 97 (internal quotation marks omitted) (quoting *LaFleur* v. *Whitman*, 300 F.3d 256, 271 (2d Cir. 2002)).

The Court pauses to explain the limits on its ability to consider the findings made as to Comfort's abuse allegations in the Divorce Action. Justice Cooper's custody decision is neither appended nor integral to the FAC, and cannot be considered on those bases. Justice Cooper's custody decision was, as Defendants note, filed under seal pursuant to New York Domestic Relations Law § 235(1). (Def. Br. 6, n.4). As a party to the underlying action, Plaintiff possesses a copy of Justice Cooper's decision and agreed to provide Defendants with a copy for this motion. (*Id.*). Defendants included a copy of the decision with their moving papers (Balin Decl., Ex. B), and urge the Court to take judicial notice of Justice Cooper's findings of fact and conclusions of law. (*Id.*).

23

This the Court cannot do. *First*, the Court is mindful of the caution that it must exercise when taking judicial notice of facts outside the record, particularly at an early stage in the litigation. *See Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998). *Second*, it is not clear that the Court can take judicial notice of this sealed, non-public decision. The cases cited by Defendants discuss the propriety of taking judicial notice of *public* court filings; none addresses the question of whether judicial notice may be taken of non-public filings. *See, e.g.*, *NorGuard Ins. Co.* v. *Lopez*, No. 15 Civ. 5032 (DRH), 2017 WL 354209, at *5 (E.D.N.Y. Jan. 24, 2017). In an abundance of caution, the Court will decline Defendants' invitation to take judicial notice of Justice Cooper's decision in the Divorce Action and will not consider it here.

As it happens, however, the First Department recently affirmed Justice Cooper's custody decision, and that decision affirming judgment is publicly available. *See Zappin* v. *Comfort*, 65 N.Y.S.3d 30 (1st Dep't 2017) ("*Zappin State II*"). In particular, the First Department affirmed Justice Cooper's decision to award sole custody to Comfort on the basis that the record below established that "[P]laintiff had physically and verbally harmed the child's mother," and it concluded that the "proceeding[s] were fair and impartial." *Id.* Both the instant case and the Divorce Action concern Comfort's allegations that Plaintiff physically abused her. As noted in the First Department's decision, the incidents of abuse were raised during the trial and were considered and

decided by Justice Cooper.  *Id.*  It is clear from the affirmance that these allegations were material to Justice Cooper's custody determination.  *Id.*

To determine whether collateral estoppel applies, the Court looks next, and finally, to whether Plaintiff had a full and fair opportunity to litigate the abuse allegations raised against him in the Divorce Action.  It is Plaintiff's burden to show that he did not have a full and fair opportunity to litigate the abuse allegations, *Colon* v. *Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995), and Plaintiff is adamant that he did not (Pl. Opp. 19-25).  Plaintiff contends that Justice Cooper systematically excluded evidence favorable to Plaintiff, was biased against him, and actively generated publicity that cast Plaintiff in an unfavorable light.  (*Id.*).

While there is no set formula to determine whether a party had a full and fair opportunity in a prior action, New York courts look to the "realities of the litigation," including the "forum for the prior litigation[] … and the context and circumstances surrounding the prior litigation that may have deterred the party from fully litigating the matter."  *Conte* v. *Justice*, 996 F.2d 1398, 1401 (2d Cir. 1993) (citations omitted).  Plaintiff here is an attorney who represented himself *pro se* in the Divorce Action.  Given the seriousness of the allegations raised against him, and the possibility that he could lose custody and visitation rights, Plaintiff had sufficient incentive to litigate the Divorce Action vigorously. And he did:  Plaintiff testified at the trial, *Zappin State II*, 65 N.Y.S.3d at 30, and conducted an extensive cross-examination of Dr. Ravitz (Hearing Tr. 8:5-73:21, 179:4-197:18).  The Court will not revisit every one of Justice Cooper's

evidentiary rulings, as Plaintiff would have the Court do.  (*See generally* Zappin

Decl.).  It is satisfied, based on its review of the record of the Divorce Action —

and the First Department's finding that Justice Cooper's rulings were "fair and

impartial," *Zappin State II*, 65 N.Y.S.3d at 30 — that Plaintiff had a full and fair

opportunity to litigate the abuse allegations made by his ex-wife.  Accordingly,

Plaintiff may not allege their falsity here in support of his claim for defamation.

## D.     The Photo Included with the Article Is Not Defamatory

The Article included a photograph of Plaintiff standing in front of a

staircase with a set of papers under his arm and, to his left, an NYPD officer.

(Article).  Plaintiff alleges that this photo is defamatory insofar as it "makes it

appear as if Plaintiff is being arrested as Defendants superimposed and/or

engineered a photograph with an NYPD police officer in the background as

Plaintiff was exiting the courthouse."  (FAC ¶ 22).  He elaborates that the image

"is particularly defamatory where Defendants falsely repeated and alleged in

the [Article] that Plaintiff engaged in various acts of criminal behavior."  (*Id.*).

This allegation does not meet the minimal plausibility requirement to

survive a motion to dismiss.  The photo does not show the officer interacting

with Plaintiff in any way.  Plaintiff's allegation is, at best, in equipoise with the

possibility that the officer was standing outside the courthouse for reasons

unrelated to Plaintiff.  Without anything beyond his conclusory allegation that

Defendants doctored this image, Plaintiff's defamation claim based on the

photograph cannot stand.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The parties are directed to file, within 30 days of the date of this Opinion, letters setting forth proposed redactions of this Opinion. The parties are further directed, within 14 days of receiving their adversary or adversaries' proposed redactions, to submit a response thereto. The parties may not submit replies in support of their proposed redactions.

SO ORDERED.

Dated:     February 2, 2018
           New York, New York
                                    _____
                                       KATHERINE POLK FAILLA
                                       United States District Judge